**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KESHA TERRY**, *et al.*, | § | |
| **Plaintiff,** | § | |
| | § | |
| *v.* | § | **Civil Action No. 3:11-CV-0660-K-BK** |
| | § | |
| **ROSEMARY INOCENCIO**, *et al.*, | § | |
| **Defendants.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

This case has been referred to the undersigned for pretrial management.  The Court now considers Defendant Chivas Square Apartments L.P.'s *Motion for Summary Judgment*, Doc. 117, Plaintiffs' *Motion for Default Judgment*, Doc. 120, Defendant Carol Boyd's *Motion to Set Aside Entry of Default*, Doc. 127, and Plaintiffs' *Motion for Leave to File Sur-Reply to Carol Boyd's Reply to Plaintiffs' Response to Carol Boyd's Objection to Plaintiffs' Motion for Default Judgment*, Doc. 136.  For the reasons that follow, it is recommended that the motion for summary judgment be **GRANTED**, the motion to set aside default be **GRANTED**, the motion for default judgment be **DENIED** as to Defendant Rosemary Inocencio and **DENIED AS MOOT** as to Defendant Carol Boyd, and the remaining motion be **DENIED AS MOOT**.

## I.  BACKGROUND[1]

This protracted Fair Housing Act ("FHA") litigation stems from events involving Plaintiffs' tenancy in the Chivas Square Apartments (the "Complex"), owned by Defendant Chivas Square Apartments L.P. ("Chivas Square").  At all times relevant to this case, Chivas Square contracted with Legend Asset Management Inc. ("Legend") to manage the Complex. Doc. 119 at 4 (Burns Aff. ¶ 5).  Defendants Rosemary Inocencio and Carol Boyd were Legend

---

[1]  In recounting the factual background, the Court summarizes the disputed facts in the light most favorable to Plaintiffs and draws all reasonable inferences in their favor.  *Owens v. Mercedes-Benz USA LLC*, 541 F. Supp. 2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.).

employees.  Doc. 119 at 4 (Burns Aff. ¶ 11).  Kesha Terry ("Terry") is an African-American mother of three children: Markus, Shemaiah, and Matthew, all Plaintiffs in this case.[2]  Doc. 131 at 5 (Terry Aff. ¶¶ 2–3).  In 2006, Plaintiffs applied for and obtained a lease at the Complex in Irving, Texas, and later switched apartments in August 2006.  Doc. 119 at 9–10, 17–18 (Terry Dep. 7:5–8:7, 39:25–40:2).  Plaintiffs were not denied access to, or otherwise discriminated against, in the acquisition of their second apartment.  Doc. 119 at 19 (Terry Dep. 43:4–9).  Plaintiffs' second apartment was an upstairs unit with two sliding doors opening to a balcony (lockable only from the inside), in addition to a front door (lockable from both sides).  Doc. 119 at 18–19 (Terry Dep. 44:15–45:7, 159:2–17).

In October 2006, Plaintiffs' garbage disposal broke.  Doc. 131 at 17 (Terry Dep. 33:16–18).  Terry went to Inocencio and apprised her of the situation, requesting that she fix it.  Doc. 131 at 17 (Terry Dep. 33:16–18).  Inocencio told Terry that she would put in a maintenance request and that she would come look at it but never did.  Doc. 131 at 18 (Terry Dep. 34:13–23).  Although the garbage disposal was never repaired, Terry never again brought it up to Inocencio or Boyd.  Doc. 131 at 18 (Terry Dep. 34:18–20).  Over time, there were other conditions that affected the tenants' enjoyment of the property.  Once, the water utilities were shut off to the entire Complex for a week due to the Complex's non-payment.  Doc. 131 at 38 (Terry Dep. 62:11–22).  On another occasion, the gas utilities were shut off to the entire Complex for the same reason.  Doc. 131 at 38–39 (Terry Dep. 62:24–63:4).  The apartment of another tenant was severely infested with mold and mildew, leading to one resident's hospitalization for asthma complications.  Doc. 131 at 86–87 (Ledra Williams Aff. ¶ 5).  According to Terry, Inocencio

---

[2]  Although in their complaint and response brief, Plaintiffs discuss at length their respective disabilities, Doc. 130 at 13; Doc. 142 at 4, their *Second Amended Complaint* alleges only that they were discriminated against on the basis of race in violation of the FHA, Doc. 142 at 9.

permitted Hispanic tenants to pay their rent late, but not African-American tenants.   Doc. 131 at 8 (Terry Aff. ¶ 9).

The events that are at the crux of this suit began in early 2007.   By late January of that year, Plaintiffs were behind on their rent.   Doc. 119 at 23 (Terry Dep. 55:18–19).   On the morning of January 24, 2007, Terry and her son Matthew returned home to find their front door lock had been changed.   Doc. 119 at 23 (Terry Dep. 55:2–17).   As a result, they were locked out for "over two hours, like three, four, about five hours" in the "hot sun" while Terry protested to Inocencio and later called the police.   Doc. 131 at 28, 30, 63 (Terry Dep. 52:15–16, 54:22–24, 151:2–20).   According to Terry, police officers told Inocencio to give Terry a key to her apartment and to let her back in; however, Inocencio only let Terry in and did not give her a key.   Doc. 131 at 64 (Terry Dep. 155:4–24).   Terry never received a new key (nor did she ask for one); consequently, she could not lock the front door when she left the apartment.   Doc. 131 at 29, 64 (Terry Dep. 53:13–14, 19–21, 155:15–24).   She could, however, lock the front door when they were inside the apartment.   Doc. 131 at 29 (Terry Dep. 53:22–23).

The next day, January 25, 2007, Plaintiffs' sliding patio door was boarded up.   Doc. 131 at 24, 107 (Terry Dep. 43:21–22; Burns Dep. 166:8–12).   However, Plaintiffs' front door was not boarded up.   Doc. 119 at 22 (Terry Dep. 50:17–19).   Chivas Square averred that plywood was used to secure the Plaintiffs' patio door "because the door would not properly latch."   Doc. 131 at 108–09 (Burns Dep. 167:11–168:7).   However, the glass patio door was the only window in Plaintiff's living room.   Doc. 131 at 26 (Terry Dep. 45:13–16).   Terry had difficulty breathing after the patio door was boarded up, so she called the ambulance to the apartment and received oxygen to "calm [her] heart down."   Doc. 131 at 52–53 (Terry Dep. 90:24–91:5).   Though Terry

could not "recall how she said it," Inocencio told the police she boarded up Plaintiffs' apartment because Terry "had people coming in." Doc. 131 at 73 (Terry Dep. 180:1–4, 21–22).

On or about January 26, 2007, Plaintiffs' electricity was turned off. Doc. 119 at 43 (Hallmark Aff. ¶ 5.g); Doc. 131 at 60 (Terry Dep. 132:1–2). That day, Terry asked Complex maintenance personnel and Inocencio to remove the boards from the patio door and both refused. Doc. 131 at 68 (Terry Dep. 164:9–25). Terry called "everyone [she] could," including police officers and code enforcement, and, according to Terry, these authorities told Inocencio to remove the boards but she did not. Doc. 131 at 67, 69 (Terry Dep. 161:15–19, 165:1–6). The same day, a City of Irving Code Inspector observed that the patio door was boarded up and the electricity was turned off. Doc. 119 at 58 (Inspection Rep't). The report further indicates that on January 30, 2007, upon confirming that apartment was still without electricity, the Complex was given a 72-hour notice that the apartment was uninhabitable. Doc. 119 at 58 (Inspection Rep't).

On January 29, 2007, Inocencio came to Plaintiffs' apartment and asked, "Are you in there?" and Terry replied "yes." Doc. 131 at 35 (Terry Dep. 59:8–10). That same day, the Complex filed suit to evict Plaintiffs in state court.[3] Doc. 119 at 7 (Judgment, No. JE-0700294L, Justice of the Peace, pct. 4 pl. 3). Plaintiffs remained in the apartment until February 2, 2007, when they moved to a motel. Doc. 119 at 28 (Terry Dep. 77:2–3, 18–21). Terry returned multiple times to retrieve some of her belongings, Doc. 119 at 29, 36–37 (Terry Dep. 78:2–5, 231:1–9); Doc. 131 at 41 (Terry Dep. 70:7–13). Plaintiffs were formally evicted from their apartment on February 12, 2007, for non-payment of at least two months' rent. Doc. 119 at 7. Terry returned to the Complex sometime after the eviction hearing — "I went that day, the 12th,

---

[3] The Court takes judicial notice of the state court judgment, not any findings of fact. *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998) (noting that a court may take judicial notice of a "document filed in another court . . . to establish the fact of such litigation and related filings.").

13th, 14th, whenever I went, that week" — and found her remaining belongings in the trash.

Doc. 131 at 41, 43 (Terry Dep. 70:9–13, 74:18–23).  The Complex routinely disposed of

belongings in this manner after tenants had moved out or otherwise vacated the premises.  Doc.

131 at 113 (Burns Dep. 189:3–10).

Terry filed a housing discrimination complaint with the Department of Housing and

Urban Development ("HUD") on August 29, 2007, alleging discrimination on the basis of race

and disability.  Doc. 119 at 39–40.  HUD issued a *Determination of No Reasonable Cause* on

March 23, 2009, finding insufficient evidence that Terry had been "treated differently in terms of

privileges, or services and facilities."  Doc. 17 at 4–9.  Terry received a letter dated July 14,

2009, from HUD informing her that her case was closed on May 12, 2009, with a determination

of no cause and informing her of her right to file an action in this Court within two years of that

date.  Doc. 119 at 38.

Proceeding without the assistance of counsel, Plaintiffs filed their original complaint with

this Court on March 31, 2011, alleging violations of the FHA and their civil rights.  Doc. 2.  The

Court later dismissed the civil rights claims and Terry's unrepresented children as parties,

leaving only the FHA claims.  Doc. 20; Doc. 28.  The Court appointed counsel for Terry and

granted her leave to file an amended complaint, which added her children as plaintiffs again and

Chivas Square as a defendant.  Doc. 65; Doc. 86; Doc. 88.  Plaintiffs' amended complaint also

alleged that Defendants shut off Plaintiffs' electricity, Doc. 88 at 6, 9–10, however, on the same

day the motion *sub judice* was filed, Plaintiffs requested leave to amend their complaint to

remove the electricity-related allegations.  Doc. 115; Doc. 142.

## II.  SUMMARY JUDGMENT EVIDENCE

Plaintiffs object to some of the summary judgment evidence proffered by Chivas Square. Plaintiffs first argue that the Affidavit of Robbie Burns contains conclusions of law and should not be considered.  Doc. 132 at 1–2.  Plaintiffs' objection is sustained in part — the Court has considered only the facts stated therein and not any conclusions of law.  Plaintiffs also object to Chivas Square's proffer of a copy of the state court judgment evicting Plaintiffs from the Complex.  Doc. 132 at 2 (citing Doc. 119 at 7).  Because the Court may take judicial notice of documents filed in another court "to establish the fact of such litigation and related filings," and does not "take notice of the factual findings of the state court" as to any disputed facts, Plaintiffs' objection is overruled.  *Taylor v. Charter Med. Corp*., 162 F.3d 827, 829 (5th Cir. 1998).

## III.  LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A party moving for summary judgment has the initial burden of  "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co.. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (internal quotations omitted).  "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Id.*
Unsubstantiated assertions, improbable inferences, and unsupported speculation are not
competent summary judgment evidence.  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.
1994).

When ruling on a motion for summary judgment, the court is required to view all facts
and inferences in the light most favorable to the nonmoving party and resolve all disputed facts
in favor of the nonmoving party.  *Id.*  However, Rule 56 does not impose a duty on the court to
"sift through the record in search of evidence" to support the nonmovant's opposition to the
motion for summary judgment.  *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.
1998); *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992).  The
party opposing summary judgment is required to identify specific evidence in the record and to
articulate the precise manner in which that evidence supports his claim.  *Ragas*, 136 F.3d at 458.

## IV.  DISCUSSION

The FHA prohibits discrimination in housing against any person based on race, color,
religion, sex, handicap, familial status, or national origin.  Plaintiffs assert claims under three
provisions of the FHA: Section 3604(a) (making it unlawful to discriminate in making a dwelling
available); Section 3604(b) (making it unlawful to discriminate in the provision of services or
facilities in connection with the rental of a dwelling); and Section 3617 (making it unlawful to
intimidate, threaten, or interfere with a person based on the exercise of their fair housing rights).
Under either provision, a plaintiff must prove discrimination.  *AHF Cmty. Dev. LLC v. City of
Dallas*, 633 F. Supp. 2d 287, 297 (N.D. Tex. 2009) (Fitzwater, C.J.).  More specifically, FHA
plaintiffs must prove that the defendant acted with discriminatory intent (disparate treatment) or
that the defendant's policies or practices resulted in a significant discriminatory effect (disparate

impact).  *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275, 280 (5th Cir. 2014).  Plaintiffs assert only a disparate treatment theory of discrimination, arguing that Chivas Square's actions were motivated by discriminatory intent toward Plaintiffs.  Doc. 142 at 9 ¶ 42.  Under a disparate treatment analysis, the protected trait "must only be one significant factor in the challenged decision to violate the FHA."  *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1556 n.30 (5th Cir. 1996) (internal quotation marks omitted).

## A.  Vicarious Liability Under the FHA

As an initial matter, Chivas Square argues, without citing any authority, that it cannot be held vicariously liable for any FHA violations allegedly committed by Defendants Inocencio and Boyd, who were the employees of Legend, an independent contractor that provided property management services.  Doc. 118 at 12.  Generally, the FHA provides for vicarious liability and imposes liability according to traditional agency principles, which "ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment."  *Meyer v. Holley*, 537 U.S. 280, 285 (2003).  Courts have held that the "duty of a property owner not to discriminate in the leasing or sale of [their] property is non-delegable. *Walker v. Crigler*, 976 F.2d 900, 904 (4th Cir. 1992); *see also Coates v. Bechtel*, 811 F.2d 1045, 1051 (7th Cir. 1987) (noting that in FHA cases, courts have imputed the wrongful acts of a rental agent to the property owner regardless of whether the owner specifically authorized the agent to engage in racial discrimination); *Marr v. Rife*, 503 F.2d 735, 741 (6th Cir. 1974) (same). Although the Court of Appeals for the Fifth Circuit has yet to weigh in on this issue, the relevant authority weighs against Chivas Square escaping liability, if any, merely as a result of its contractual relationship with Legend.

## B. Disparate Treatment

To prove disparate treatment without direct evidence, the Court applies the same burden-shifting standard used in Title VII employment discrimination cases, as outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Arbor Bend Villas Hous., L.P. v. Tarrant Cnty. Hous. Fin. Corp.*, No. 02-CV-0478, 2005 WL 548104 at *5 (N.D. Tex. 2005) (Means, J.); *see also Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1229 (5th Cir. 1996) (recognizing the "strong similarities between the language, design, and purposes of Title VII and the [FHA]."). Under *McDonnell Douglas*, "the plaintiff must initially establish a prima facie case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination." *Arbor Bend*, 2005 WL 548104 at *6. "Once the plaintiff establishes a prima facie case, then the burden shifts to the defendant to articulate — but not prove — a legitimate nondiscriminatory reason for its action." *Id.*; *see McDonnell Douglas*, 411 U.S. at 802. A defendant meets this burden by producing admissible evidence of a reason that would be "legally sufficient to justify a judgment for the defendant." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981). If the defendant meets its burden of production, then the burden shifts back to the plaintiff to show that "the reason proffered by the defendant is merely a pretext for discrimination." *McDonnell Douglas*, 411 U.S. at 802.

### 1. Section 3604(a)

Section 3604(a), in relevant part, makes it unlawful to "make unavailable, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). In order to prevail under that section, Plaintiffs must prove that: (1) they are members of a protected class; (2) they rented an apartment from Defendants; (3) Defendants made the apartment unavailable to them; and (4) their protected class was a significant factor in the

decision.  The parties' dispute centers on the last two elements: whether race was a significant factor and whether the statutory phrase "make unavailable" applies to conduct that occurred after Plaintiffs had already begun leasing from the Complex.

   *a.  Habitability versus Unavailability*

   At the outset, it is unclear if either of Defendants' actions: (1) changing the lock to the front door of Plaintiffs' apartment and subsequently not providing Plaintiffs with a new key ("the lockout"), or (2) boarding up the glass patio door and subsequently refusing to remove the boards ("the boarding up"), made the apartment "unavailable" as contemplated by the statute.  Chivas Square argues that the plywood on Plaintiffs' patio doors did not hinder their ability to use the front door and, thus, such circumstances do not constitute a lack of habitability required to establish constructive eviction.  Doc. 118 at 16–17.  Plaintiffs aver that they were constructively evicted because Chivas Square denied them the ability to freely enter and exit their apartment, which, at the very least, should be a fact issue for a jury.  Doc. 130 at 21.  Contrary to Plaintiffs' argument, whether a particular type of conduct violates a federal statute is a matter of law for the Court, not the jury, to determine.  The Court concludes that acts that affect only the habitability of the dwelling, but do not rise to the level of constructive eviction, do not "make unavailable" a dwelling.

In *Cox v. City of Dallas*, 430 F.3d 734, 740–41 (5th Cir. 2005), the Court of Appeals for the Fifth Circuit considered whether habitability is within the ambit of Section 3604(a).  There, homeowners in a predominantly black Dallas neighborhood argued that the city failed to police illegal dumping in their neighborhood, thus lowering the value of their properties.  *Id.* at 736–37.  The court held that the simple language of Section 3604(a) does not apply to current homeowners whose complaint is that the value or habitability of their houses has decreased

because Section 3604(a) addresses only availability.  *Id.* at 741.  The Fifth Circuit also

specifically noted the FHA's legislative history revealed the concern of Congress was only

*access* to housing.  *Id.*  In reaching its conclusion, the Fifth Circuit relied heavily upon a decision

of the Seventh Circuit.  In *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388

F.3d 327 (7th Cir. 2004), the Seventh Circuit held that the FHA did not apply to post-acquisition

action, save for a possible exception where it caused actual or constructive eviction.  388 F.3d at

329.  Subsequently, the Seventh Circuit, sitting en banc, has affirmed *Halprin* as to Section

3604(a).  *Bloch v. Frischholz*, 587 F.3d 771, 777–79 (2009) (noting that the analogy to

constructive eviction is imperfect and holding that availability, not habitability, is the right

protected by Section 3604(a)).

    Interpreting *Cox*, this Court previously has found it "questionable whether a constructive

eviction-type claim is even cognizable under [Section] 3604(a)."[4]  *AHF*, 633 F. Supp. 2d at 300

(noting that the Fifth Circuit rejected "only those habitability claims that fall short of

constructive eviction, leaving the question of constructive eviction for another day." (quoting

*Cox*, 430 F.3d at 742 n.21)).  In *AHF*, an apartment owner alleged that the city conducted two

harassing "raids" on minority residents, which triggered a decline in occupancy and caused the

plaintiff to later default on its debt.  *Id.* at 289–91.  Assuming that constructive eviction was a

viable theory, Chief Judge Fitzwater described what would rise to the level of rendering

continued residence objectively unreasonable — the "denial of certain essential services relating

---

[4]  In Texas, constructive eviction is: an intention of the landlord that the tenant shall no longer
enjoy the premises; a material act by the landlord that substantially interferes with the use and
enjoyment of the premises for the purpose they are let; a permanent deprivation of the tenant's
use and enjoyment of the premises; and abandonment by the tenant of the premises within a
reasonable time after the act.  *Metroplex Glass Ctr. Inc. v. Vantage Props. Inc.*, 646 S.W.2d  263,
265 (Tex. App.—Dallas 1983).  The Tenth Circuit has described constructive eviction as
focusing on "malicious acts of landlord aimed at ousting a tenant in rightful possession." *Honce
v. Vigil*, 1. F.3d 1085, 1091 (10th Cir. 1993).

to a dwelling, such as mortgage financing, sewer hookups, zoning approval, or basic utilities."
*Id.* at 300 (quoting *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714, 719–20
(D.C. Cir. 1991)); *see also Cox*, 430 F.3d at 742–43 & n.18 (noting that courts have construed
the phrase "otherwise make unavailable or deny" in Section 3604(a) to encompass racial steering
(locking out owners of one race but not another), mortgage redlining, insurance redlining, and
exclusionary zoning).  Applying these precepts, the Court hypothesized that the "distinction
between habitability and availability of housing would be materially blurred if not erased
entirely" if "incidents that merely made a residence less desirable could amount to a constructive
eviction."  *Id.* at 301.

Here, Plaintiffs basically allege two acts affecting the habitability of their residence: the
boarding up and the lockout.[5]  The Court need not decide whether habitability claims can make
an apartment unavailable for FHA purposes because both of Plaintiffs' habitability allegations
fall within the scope of *Cox* and do not amount to constructive eviction.  The substance of
Plaintiffs' boarding up allegation is that the boards blocked light to their apartment and inhibited
entry, making their apartment objectively unlivable.  Doc. 130 at 22–23.  Light, however, is not
an essential service that Defendants are obligated to offer, and the lack thereof would otherwise
not be severe but for Plaintiffs' non-payment of their electric bill.  Doc. 119 at 43 (Hallmark Aff.
¶ 5.d); *see AHF*, 633 F. Supp. 2d at 300–01 (detailing such essential services).  Conversely, the
Complex's refusal to furnish Plaintiffs a new key to the apartment upon changing the locks
certainly impacted Plaintiffs' enjoyment and use of the property.  It did not amount to

---

[5]  Plaintiffs' evidence regarding the Complex's refusal to remedy mold and mildew is not
actionable under Section 3604(a) as a detriment to Plaintiffs' habitability.  *See Honce*, 1. F.3d at
1091 ("Past acts of the landlord toward others are not relevant to the current question of whether
the landlord acted maliciously toward the plaintiff-tenant.").  Moreover, Plaintiffs arguments that
her previous request for repair of her garbage disposal and interruptions of water and gas service
to the Complex are not actionable because she failed to allege them in the administrative action
and only complained of events beginning with the lockout on January 24, 2007.

constructive eviction, however, because it did not prevent Plaintiffs from living in the apartment; it only prevented Plaintiffs from locking the apartment when they left.  Doc. 131 at 29 (Terry Dep. 53:19–21).  Thus, the lockout did not affect the apartment's habitability.

   *b.  No Discriminatory Intent*

   Regardless of whether the lockout meets the statutory definition of unavailability, Plaintiffs have not and cannot establish that race was a significant factor in these actions.  To be sure, every bad act directed toward a member of a protected class is not owing to discrimination.  Plaintiffs first fail to establish a prima facie case under Section 3604(a) because the only evidence they present on that point is Terry's <u>assumption</u> that racial discrimination was the basis for her lockout.  For example, she contends that her garbage disposal was not repaired as promised because she is African-American and other blacks also complained of their unspecified maintenance requests going unfulfilled, but since she saw the Hispanic maintenance man at the apartments of Hispanic tenants, he must have been making unspecified repairs for the Hispanic tenants to the exclusion of the African-American ones.  Doc. 131 at 17, 20–23 (Terry Dep. 33:16–22, 37:13–41:23).

   Even assuming Plaintiff has stated a prima facie case of discriminatory motive, Chivas Square has provided a non-discriminatory reasons for changing the locks on the entry door to deny access — Terry's failure to pay rent.  Terry does not contest that she was behind on her rent at the time of the lockout, Doc. 17 at 7–8; consequently, she cannot show that Defendants' reason for doing so was pretext.  Indeed, she does not even argue the point.  As no genuine issue of material fact exists as to Terry's section 3604(a) claim relating to the lockout, Defendant is entitled to summary judgment in its favor.

Even if the boarding up made the apartment "unavailable" to them as contemplated by Section 3604(a), Plaintiffs again fail to establish a prima facie case of discriminatory intent.  In her deposition testimony, Terry alternatively blames the boarding up of her patio door and eviction on racial bias and her complaints to police.  Doc. 131 at 33–35.  Assuming Plaintiff has stated a prima facie case of discriminatory motive, Chivas Square has provided a non-discriminatory reason for boarding up the patio door and changing the locks on the entry door to deny access — the broken latch and observation of someone attempting to break in.  Doc. 131 at 109 (Burns Dep. 168:13–17).  As to Chivas Square's proffered safety reason for boarding up the patio door, Doc. 131 at 108–110, Plaintiffs only counter that there was no damage to the latch, Doc. 131 at 36 (Terry Dep. 60:12–22).  It is reasonable to infer from the evidence, however, that Terry was not present when the alleged attempt to break-in or the boarding up occurred, thus, she could not have known the condition of the lock at that time.  Even assuming that Terry is correct that the lock was not damaged, that is insufficient to show pretext.  *See Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402 (5th Cir.2001) ("To carry that burden, the plaintiff must produce <u>substantial</u> evidence of pretext." (emphasis added)).  It is not enough to show that Defendant's non-discriminatory reason is <u>wrong</u>, she has to show that it was pretext for racial animus.

Indeed, the only proffered evidence that even comes close to showing discriminatory intent is Terry's account of Inocencio's comment to the police that the patio door was boarded up because Inocencio was "just trying to keep [Terry] out of this unit because she had people coming in."  Doc. 131 at 73 (Terry Dep. 180:1–4, 21–22).  That statement is just as consistent with Defendant's proffered reason that there had been a break-in attempt Doc. 131 at 109 (Burns Dep. 168:13–17), despite Terry's extrapolation that the "people" referred to were her "black

American friends." Doc. 131 at 34 (Terry Dep. 58:21–25).  Thus, Plaintiffs' evidence cannot establish pretext because it fails to show inconsistency between Defendants' proffered reason and actual practices.  *See Inclusive Cmtys. Protect, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 749 F. Supp. 2d 486, 507 (N.D. Tex. 2010) (Fitzwater, C.J.) (inferring pretext where plaintiff had presented some evidence that defendants' practices did not corroborate their explanation).  Terry's mere suggestion that Inocencio's concern was the race of her visitors, without more, is insufficient to raise a genuine issue of material fact as to pretext.  *See Jim Sowell Constr. Co. v. City of Coppell*, 61 F. Supp. 2d 542, 546 (N.D. Tex. 1999) (Fitzwater, J.) (requiring that the decisionmaker select a particular course of action <u>because of</u>, not merely <u>in spite of</u>, its adverse effects on a protected group (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).  Accordingly, Defendants should be entitled to summary judgment dismissing Plaintiffs' Section 3604(a) claim.

### *2.  Section 3604(b)*

Section 3604(b) prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith."  42 U.S.C. § 3604(b).  In *Cox*, the Fifth Circuit held that the phrase "in connection therewith" refers to the sale or rental of a dwelling rather than to the dwelling itself.  430 F.3d at 745; *accord AHF*, 633 F. Supp. 2d at 301–02.  The court of appeals noted, however, that Section 3604(b) may encompass the claim of a renter for discrimination relating to actual or constructive eviction.  *Cox*, 430 F.3d at 746–47 (citing *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982) ("[W]hen a landlord imposes on white tenants the condition that they may lease his apartment only if they agree not to receive blacks as guests, the landlord has discriminated against the tenants in the 'terms, conditions and privileges of rental' on the grounds of 'race.'")).

Thus, the imposition of discriminatory conditions upon a tenant's lease violates Section 3406(b).

*Lundy*, 667 F.2d at 1201.

Here, Inocencio's comment that Terry "had people coming in," Doc. 131 at 73 (Terry Dep. 180:1–4, 21–22), does not implicate racial discrimination in any way and was never communicated to Terry as a condition placed upon her lease. Even assuming that Defendants imposed a condition upon Terry's lease agreement, Plaintiffs would still fail to make a prima facie case under subsection (b) for the same reasons as subsection (a). Further, Plaintiffs' admission that they failed to timely pay their rent would constitute a legitimate, nondiscriminatory reason for Plaintiffs' eviction. *Burdine*, 450 U.S. at 253–54. Thus, Defendants should be entitled to summary judgment dismissing Plaintiffs' Section 3604(b) claim.

**C. Retaliation**

Section 3617 makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section [3604] of this title." 42 U.S.C. § 3617. FHA retaliation claims are analyzed under the same standards used for Title VII retaliation claims. *Avalon Residential Care Homes, Inc. v. City of Dallas*, No. 11-CV-1239, 2011 WL 4359940 at *8 (N.D. Tex. 2011) (Fitzwater, C.J.). To assert a prima facie case of retaliation, a plaintiff must show (1) she engaged in the exercise or enjoyment of her rights protected by the FHA; (2) the defendant subjected her to an adverse action (coercion, threats, or interference); and (3) a causal connection exists between the protected activity and the adverse action. *See id.* at *9 (citing *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001)). A causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action. *Oxford House, Inc. v. City of Baton Rouge*, 932

F. Supp. 2d 683, 702 (M.D. La. 2013) (quoting *Cifra v. Gen. Elec. Co*., 252 F.3d 205, 217 (2d Cir. 2001)).

Though the Fifth Circuit did not address Section 3617 in *Cox*, it has since suggested that there is a connection between the scope of Sections 3604 and 3617 in two unpublished cases. *See Reule v. Sherwood Valley I Council of Co-Owners, Inc*., 235 F. App'x 227, 227–28 (5th Cir. 2007) (per curiam) (citing *Cox* and holding that the plaintiff's claims under Sections 3604 and 3617 fail because they go to the habitability of her condo and not the availability of housing); *McZeal v. Ocwen Fin. Corp*., 252 F.3d 1355, *2 (5th Cir. 2001) (per curiam) (table decision) ("Because his § 3605 claim fails, McZeal's claim under § 3617 must also fail."). Chief Judge Fitzwater has also held that, to be actionable under Section 3617, a defendant's conduct must make housing unavailable, not merely less habitable. *AHF*, 633 F. Supp. 2d at 302–03. Thus, the scope of Section 3617 tracks that of Section 3604 — habitability claims are only actionable, and thus considered adverse actions, if they rise to a level severe enough to make a residence unavailable. As previously discussed herein, neither the lockout or the boarding up amount to more that habitability claims, and certainly do not implicate the <u>availability</u> of the dwelling. Thus, Defendant is entitled to summary judgment because Plaintiffs have failed to establish that they were subjected to an adverse action under the statute. *See Reule*, 2006 WL 5003189 at *9–10 (holding that plaintiff's claims of harassment by her landlord and neighbors, the landlord calling the police on children for playing kickball, and the landlord attempting to have the plaintiff arrested — all of which occurred after the plaintiff filed a complaint exercising her fair housing rights — went to the habitability and not availability of housing).

That notwithstanding, however, Plaintiffs have again failed to produce evidence of discriminatory intent. Plaintiffs contend that Defendants did not like Terry's advocacy on behalf

of fellow African-Americans.  Doc. 130 at 26.  There is absolutely no evidence, however, that Terry's advocacy on behalf of black tenants occurred in temporal proximity to the boarding up and/or locking out.  Specifically, while Plaintiffs present evidence of Terry's encouragement of others in their dealings with Complex management, Doc. 131 at 86 (Ledra Williams Aff. ¶ 3), such activity, even assuming it is protected by the FHA, is insufficient to establish a causal connection because its vagueness makes it impossible to determine whether the adverse action "closely followed" the protected activity in time.  *Oxford House*, 932 F. Supp. 2d at 701 (citing *Cifra*, 252 F.3d at 217).  The record is rife with Terry's conclusory testimony that Defendants' conduct is "discrimination," Doc. 131 at 20, 28, 50 (Terry Dep. 37:21–22, 52:11, 87:11–13), but merely surmising that racial animus is the basis for the lockout and/or boarding up is not competent summary judgment evidence.  *Thornton v. Neiman Marcus*, 850 F. Supp. 538, 544 (N.D. Tex. 1994) (Sanders, C.J.) (multiple statements attesting to a subjective opinion did not constitute summary judgment evidence).  Therefore, Plaintiffs fail to establish a prima facie case for retaliation.

Even if Plaintiffs could establish a prima facie case of retaliation, the Court has already noted that Defendants have a legitimate, nondiscriminatory explanation for changing Plaintiffs' locks and refusing a new key — non-payment of rent.  Doc. 119 at 23 (Terry Dep. 55:13–19).  Likewise, Defendants have proffered evidence that the boarding up was motivated by safety concerns, Doc. 131 at 109 (Burns Dep. 168:13–17), rather than racial animus.  In light of these explanations, Plaintiffs have wholly failed to establish that race was the "but for" cause of the alleged retaliation.  *Cf.*, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation").

In sum, while Defendants may have operated outside of procedures enumerated in the Texas Property Code, without proof of racial motivation, the FHA simply offers no redress.  *See Honce*, 1 F.3d at 1091 (plaintiff brought both FHA claims <u>and</u> a state law claim for violation of the covenant of quiet enjoyment).  Accordingly, for the reasons previously stated, Defendants should be entitled to summary judgment dismissing all of Plaintiffs' FHA discrimination and retaliation claims.

## V.   DEFAULT JUDGMENT

In response to Plaintiffs' *First Amended Complaint*, Chivas Square filed an answer, but Inocencio and Boyd did not.  Doc. 93 at 1.  Attorney Keith Alan Ward, then counsel for Inocencio and Boyd, was disbarred in Texas on January 27, 2014, and by this Court on June 16, 2014, leaving Inocencio and Boyd without representation.  Doc. 112.  On June 25, 2014, Inocencio and Boyd were ordered to retain counsel by July 8, 2014, or the Court would presume they intended to proceed without the assistance of counsel.  Doc. 112.  Plaintiffs requested the Clerk enter a default as to Inocencio and Boyd on June 30, 2014, which the Clerk did the same day.  Doc. 114; Doc. 116.  By the end of the day, Plaintiffs had moved for default judgment against Inocencio and Boyd.  Doc. 120.

On July 7, 2014, Boyd answered Plaintiffs' amended complaint through counsel. Doc. 122.  On July 18, 2014, Boyd moved to set aside the default entered by the clerk in light of her answer.  Doc. 127.  Inocencio has yet to respond to the Court's order regarding counsel or Plaintiffs' motion for default judgment.  *See* Doc. 120 at 8–9 (certifying that Inocencio was sent a copy of Plaintiffs' motion).

Federal Rule of Civil Procedure 55(c) provides that the "court may set aside an entry of default for good cause."  The requirement of good cause has generally been interpreted liberally.

*Hilseweck P'ship v. E. Energy Res., Inc.*, No. 11-CV-0186, 2011 WL 3501719, at *1 (N.D. Tex. 2011) (Fitzwater, C.J.).  Three factors are examined for determining good cause: (1) whether the failure to act was willful; (2) whether setting the default aside would prejudice the adversary; and (3) whether a meritorious claim has been presented.  *Effjohn Int'l Cruise Holdings, Inc. v. A & L Sales, Inc.*, 346 F.3d 552, 563 (5th Cir. 2003).  These factors are not exclusive; other factors may be considered, such as whether the party acted expeditiously to correct the default.  *Id.*  "The decision to set aside a default decree lies within the sound discretion of the district court."  *United States v. One Parcel of Real Prop.*, 763 F.2d 181, 183 (5th Cir. 1985) (citation omitted).

As to Boyd, her failure to act was not willful.  She represents that she never received Plaintiffs' first amended complaint because it was served on her former counsel and he never forwarded it to her, and that she appeared as ordered at a settlement conference before Judge Stickney in February 2014.  Doc. 127-1 at 2.  Second, setting aside the default will not unfairly prejudice Plaintiffs.  "The mere fact that setting aside the default will delay their recovery or require that they litigate their claims is insufficient."  *Verity Instrs., Inc., v. KLA-Tencor Corp.*, No. 06-CV-0005, 2006 WL 929235 at *2 (N.D. Tex. 2006) (Fitzwater, J.) (brackets and citations omitted).  Plaintiffs' claims against Boyd are substantially similar to the issues they must litigate against Chivas Square.  Finally, Boyd's answer presents at least two potentially meritorious defenses to Plaintiffs' claims: (1) she cannot be held individually liable and is not properly a defendant in this lawsuit; and (2) Plaintiffs lack standing to bring complaints regarding Boyd's treatment of other African-Americans.  Doc. 122 at 5.  Finally, Boyd acted expeditiously to correct her default once the Clerk entered default.  The Court concludes that there is "good cause" to set aside the entry of default as to Boyd, and her motion for the same should be

**GRANTED**.  Consequently, Plaintiffs' motion for default judgment should be **DENIED AS MOOT** as to Boyd.

As to Inocencio, default judgment is not appropriate until the conclusion of this case when all defendants' liability has been established.  *Mori Seiki USA, Inc. v. McIntyre*, No. 06-CV-2344, 2008 WL 577274 at *2 (N.D. Tex. 2008) (Boyle, J.) ("Where one of multiple defendants is in default . . . a decree of default may be entered, but a judgment is withheld pending a decision on the merits as to the other defendants." (quoting *Raleigh Cycle Co. of Am. v. Risha*, No. 84-CV-0522, 1987 WL 11889 at *1 (S.D. Tex. 1987))).  In light of the foregoing recommendations that summary judgment should be granted, Plaintiffs' motion for default judgment should be **DENIED**.

## VI.   ATTORNEYS' FEES

Chivas Square requests attorneys' fees under 42 U.S.C. § 3613.  Section 3613 provides that the Court, "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and costs."  42 U.S.C. § 3613(c)(2).  Chivas Square argues that Plaintiffs' action is groundless and has caused it to incur thousands of dollars in attorneys' fees.  Doc. 118 at 21.  Although Plaintiffs, who were proceeding without the assistance of counsel at the initiation of this case, clearly chose the wrong forum and claims to obtain redress, Defendants' actions were nevertheless egregious.  Accordingly, in its discretion, the Court declines to award Chivas Square attorneys' fees.

## VII.   CONCLUSION

Accordingly, it is recommended that: (1) Defendant Chivas Square's *Motion for Summary Judgment*, Doc. 117, be **GRANTED**; (2) Plaintiffs' *Motion for Default Judgment*, Doc. 120, be **DENIED** as to Inocencio and **DENIED AS MOOT** as to Boyd; (3) Defendant

Carol Boyd's *Motion to Set Aside Entry of Default*, Doc. 127, be **GRANTED**; and (4) Plaintiffs'

*Motion for Leave to File Sur-Reply to Carol Boyd's Reply to Plaintiffs' Response to Carol*

*Boyd's Objection to Plaintiffs' Motion for Default Judgment*, Doc. 136, be **DENIED AS**

**MOOT**.  Final Judgment should be entered in favor of Defendants, and this Case should be

**CLOSED**.

       **SO RECOMMENDED** on September 2, 2014.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

       A copy of these findings, conclusions and recommendation shall be served on all parties
in the manner provided by law.  Any party who objects to any part of these findings, conclusions
and recommendation must file specific written objections within 14 days after being served with
a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection
must identify the specific finding or recommendation to which objection is made, state the basis
for the objection, and specify the place in the magistrate judge's findings, conclusions and
recommendation where the disputed determination is found.  An objection that merely
incorporates by reference or refers to the briefing before the magistrate judge is not specific.
Failure to file specific written objections will bar the aggrieved party from appealing the factual
findings and legal conclusions of the magistrate judge that are accepted or adopted by the district
court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d
1415, 1417 (5th Cir. 1996).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE